LEGAL SERVICES OF NORTHERN CALIFORNIA
Laurance H Lee, State Bar No. 301482
Karen E. Kontz, State Bar No. 300918
Sarah R. Ropelato, State Bar No. 254848
Sarah J. Steinheimer, State Bar No. 267552
515 12th Street
Sacramento, CA 95814
Telephone: (916) 551-2150
Facsimile: (916) 551-2196
E-mail: llee@lsnc.net

*Attorneys for Plaintiffs Betty Rios,*
*Lucille Mendez, Palmer Overstreet,*
*Sacramento Homeless Organizing Committee*

## UNITED STATES DISTRICT COURT FOR THE
## EASTERN DISTRICT OF CALIFORNIA
## SACRAMENTO DIVISION

| | |
|---|---|
| BETTY RIOS, LUCILLE MENDEZ, PALMER OVERSTREET, SACRAMENTO HOMELESS ORGANIZING COMMITTEE <br><br> Plaintiffs, <br><br> v. <br><br> COUNTY OF SACRAMENTO; NAV GILL, in his official capacity as Sacramento County Executive; COUNTY OF SACRAMENTO, as Successor Agency for the Redevelopment Agency of the County of Sacramento; SACRAMENTO COUNTY SHERIFF'S DEPARTMENT; SCOTT JONES, in his official capacity as Sacramento County Sheriff; SACRAMENTO HOUSING AND REDEVELOPMENT AGENCY; LA SHELLE DOZIER, in her official capacity as Executive Director of the Sacramento Housing and Redevelopment Agency; DEPUTY LEE, individually and in his official capacity as Deputy Sheriff for the County of Sacramento. <br><br> Defendants. | Case No.: <br><br> **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND DAMAGES** |

## I.   **PRELIMINARY STATEMENT**

1.      On any given night, more than 3,000 people are homeless in Sacramento County. These 3,000 individuals must compete against each other for one of only 762 shelter beds in the County. County of Sacramento, *Homeless Plan,* Nov. 30, 2018 at 19. Likewise, Sacramento has a severe shortage of housing that is available to its lowest income residents—there is a gap of over 57,000 rental units for such residents in the region. *The Gap: A Shortage of Affordable Homes*, Nat'l Low Income Housing Coalition, at Appendix B (March 2019), https://reports.nlihc.org/sites/default/files/gap/Gap-Report_2019.pdf. In express recognition that these residents cannot obtain shelter or permanent housing, Defendant County of Sacramento declared a Shelter Crisis on October 16, 2018 in an effort to obtain additional funding to address the drastic need for additional shelter beds.

2.      Despite acknowledging that unsheltered people have nowhere to be during the day and night, Defendants County of Sacramento and Sacramento County Sheriff's Department persist in criminalizing those who must sleep and rest on public land in violation of *Martin v. City of Boise*, 902 F.2d 1031 (9th Cir. 2018).

3.      To that end, on April 28, 2019, Defendants suddenly and unexpectedly served a 72 Hour Notice to Vacate (the "Notice") that informed residents who lived on two adjacent parcels of land located on Stockton Boulevard ("Stockton Encampment") that they have to leave or face criminal prosecution. Specifically, the Notice stated that "Every person who camps/ lodges or stores property on public lands without permission of the owner is committing a misdemeanor violation."

4.      The Stockton Encampment is a publicly owned lot that has been vacant for almost a decade after Defendant Sacramento Housing and Redevelopment Agency ("SHRA") purchased it. The residential hotel and mobile home park that were on the site when SHRA purchased it were demolished for the

purpose of redevelopment that has yet to materialize. At the time of the Notice, approximately 100 people were residing at the encampment, the lot had dumpster and trash services along with portable restrooms provided by the County, and a community of residents unable to access shelter elsewhere.

5.      Three days after issuing the Notice, Defendants deployed a fleet of Sheriff's Deputies, some of whom were outfitted with batons and riot gear, and at least 15 Sheriff vehicles, to remove Plaintiffs from the Stockton Encampment. Defendants also deployed a helicopter overhead blaring orders to the residents to disperse or face arrest. During this raid, Defendant County of Sacramento, joined and assisted by the remaining Defendants, illegally displaced and destroyed the personal property of approximately 100 residents. As a result, the residents were forced to frantically take the items they could carry, leave critical items behind, and flee to the surrounding sidewalk and nearby streets. Notably, Defendants did not deploy social service agencies, mental health professionals, or shelter providers.

6.      Defendants' unlawful actions deprived individual Plaintiffs of personal belongings that are critical to their survival, such as clothing, medication, tents and blankets, as well as irreplaceable personal possessions, such as family photographs, records, and documents. Defendants' actions also criminalized individual Plaintiffs' presence in a public space and traumatically displaced them without a relocation plan, shelter, services or support for the residents. The raid left individual Plaintiffs even more destitute, defenseless, and vulnerable.

7.      Defendants have provided no lawful justification to support their threats to arrest people for involuntarily living in public space, nor the seizure and destruction of their life-sustaining property and traumatic forced closure of a lot abandoned by all but a community of Sacramento residents living without shelter. Defendants' actions during the raid were unnecessary and unconstitutional.

## II.    JURISDICTION AND VENUE

8.    This is a civil rights action arising under 42 U.S.C. § 1983 and the Fourth, Eighth, and Fourteenth Amendments to the United States Constitution. This Court has jurisdiction under 28 U.S.C. § 1331 (federal question jurisdiction) and § 134 (civil rights jurisdiction).

9.    Venue in the Eastern District of California is proper under 28 U.S.C. § 1391(b)(1), because the County of Sacramento is located in this district, and under § 1391(b)(2), because a substantial part of the events giving rise to the claims occurred in this district.

## III.    FACTUAL ALLEGATIONS

### THE STOCKTON ENCAMPMENT

10.    The Stockton Encampment consists of two undeveloped parcels located at 5700 Stockton Boulevard, Sacramento, California and 5716 Stockton Boulevard, Sacramento, California.

11.    The Stockton Encampment was formerly the San Juan Motel and Hood Mobilehome Park. In 2008, SHRA purchased and/or received the parcels with plans to develop affordable housing. To this end, the San Juan Motel and Mobilehome Park were demolished by mid-2010.

12.    The land was never developed and remained vacant after the demolition. Individual Plaintiffs and other similarly situated homeless individuals stayed or moved onto the property because they had nowhere else to go. Homeless community members have been residing on the property for the past nine years. In January 2019, SHRA began installation of a wrought-iron fence around the property that is now gated and locked.

### THE NOTICE

13.    On April 28, 2019, Defendant Sacramento Sheriff's Department posted copies of the Notice throughout the Stockton Encampment. The Notice states that

"Every person who camps/ lodges or stores property on public lands without permission of the owner is committing a misdemeanor violation." Additionally, the Notice further states that a "Site Clean-up" would occur on May 1, 2019 at 8 AM.

14.     The Notice failed to provide meaningful information on how to reclaim residents' property if removed by Defendants. Under the "Instructions for Retrieving Your Property" section, the Notice instructs residents to call "(916) _____" to inquire about their property. The Notice further states three possible storage locations for any collected property, but did not indicate which of these, if any, would be used.

15.     The Notice (1) does not provide meaningful and effective notice to those who would be affected by Defendants' action; (2) fails to provide essential information on how to retrieve property; (3) does not inform recipients that personal property would be destroyed summarily; and (4) criminalizes sleeping/camping on public property in the absence of available shelter beds despite federal court rulings barring such practices.

### THE RAID

16.     Defendants raided the Stockton Encampment on May 1, 2019. At around 8:00 A.M., the initial wave of Sheriff's Deputies arrived on site and began their operations. Soon after, additional Sheriff's Deputies, some wearing riot gear and holding batons, formed a line and forced most of the Stockton Encampment residents and community members gathered in support to the sidewalk.

17.     The Sheriff's Department deployed at least 15 Sheriff's vehicles and one helicopter during this raid. The Sheriff's vehicles lined the streets of Stockton Boulevard and created physical barriers that controlled access to the Stockton Encampment. The restricted access gave the Sheriff's Department almost complete control of who was allowed in and out of the Encampment. As residents were pushed further away from their home and belongings, a helicopter circled above,

repeatedly blaring out warnings that the now displaced residents were unlawfully assembling and must disperse, or face arrest or physical force.

18.     Once the Sheriff's Deputies blocked the entrance to the Stockton Encampment by forming a blockade and locking the gates, the Sheriffs drove back hoes, dump trucks, garbage trucks, and other vehicles onto the property. Sheriff's Department workers indiscriminately hauled and raked away items into the garbage trucks. The Sheriff's Department workers did not use care in handling the individual Plaintiffs' unabandoned property and treated almost all items as if they were presumptively trash.

19.     While the Sheriffs allowed some residents to enter the property to remove items, many residents—including individual Plaintiffs—were not able to recover all of their property. No warrants were provided prior to the raid, nor any exception to the warrant requirement identified. Additionally, no notice was provided to inform residents where or if the Sheriff's Department would be collecting and itemizing their property.

20.     The displaced residents had nowhere to go after the raid because the County did not have enough shelter beds. On the day in question, two of the largest shelter programs in Sacramento were not open for those seeking shelter. The County's Winter Sanctuary program is a seasonal shelter, and had already closed for the season. The Railroad Avenue Shelter, operated by the City of Sacramento, permanently closed its doors just before the raid. Further, Defendant Sacramento County's emergency shelters for individuals without children are by invitation only.

21.     The County's Department of Human Assistance was noticeably absent during the raid.

//

//

//

**PLAINTIFFS**

**Betty "Bubbles" Rios**

22.     Plaintiff Betty "Bubbles" Rios is and has been a resident of the County of Sacramento at all relevant times.

23.     Ms. Rios grew up in Rio Linda, a small town located in Sacramento County. She attended elementary, middle, and high school in the Rio Linda School District. From 1998 to 2010, Ms. Rios lived in the Hood Mobilehome Park previously on the Stockton Encampment lot with her family. When Defendant SHRA demolished the mobilehome park, she was promised relocation and a right to return once they build affordable housing on the site.

24.     Through no fault of her own, Ms. Rios was made homeless upon Defendant SHRA's demolition of the park. With nowhere safe to go and not enough income to afford monthly rent, Ms. Rios has lived at the Stockton Encampment for much of the past nine years. She periodically was forced off the property, but returned because this was her home and she had nowhere else to safely sleep and rest.

25.     Ms. Rios resided at the Stockton Encampment because she cannot afford to replace the housing she lost when Defendant SHRA demolished her home and failed to develop a new one. She also could not access an emergency shelter bed. Prior to the raid, she tried calling shelters and service providers on multiple occasions, but the shelters were always full. Additionally, Ms. Rios has no income because she has reached the three-month limit for General Assistance, a cash aid program of last resort for indigent Sacramento residents who have no other means of support. She cannot pay for any type of shelter.

26.     At the Stockton Encampment, Ms. Rios slept in a tented tarp. The tarp protected her from the weather while she slept and rested and kept her possessions safe. Ms. Rios had many possessions in the tarp, including clothes, medicine, a

breathing machine, and a bone stimulator for her arm. The tarp provided her with privacy from other members of the community. Ms. Rios does not have access to any other private space where she can store her possessions.

27.     On the day of the raid, Deputy Sheriff Lee injured Ms. Rios. Ms. Rios was standing outside the gate that separated her from her home, possessions, and community. She was worried about what would happen to her property and the other residents that lived at the Stockton Encampment. She was not armed and was not a threat. Despite these circumstances, Deputy Sheriff Lee grabbed Ms. Rios' arm and exerted excessive force that led to injury. Ms. Rios arm, which was previously injured but had substantially healed, was re-broken. Emergency vehicles arrived and took her to the hospital for treatment.

28.     When she returned from the hospital several hours later with her arm in a cast, the Sheriff's workers had already removed a good portion of her property and other property on site. Ms. Rios lost her breathing machine, bone stimulator, and medication in the chaos of the raid, in addition to her clothes and other personal items. Ms. Rios was not told how or if any of her property could be reclaimed.

29.     In addition to illegally destroying her needed personal property, Defendants issued Ms. Rios a Notice of Trespass threatening prosecution for trespass on private property under the state Penal Code and Sacramento County Code 9.80.010. She did not know why she received the Notice of Trespass because she had already exited the encampment and at all relevant times had slept on publicly-owned land.

30.     Based on the raid and the communications from the Sheriff's Department before, during and following the raid, Ms. Rios fears that Defendants will continue to use these heavy-handed practices to remove herself and other residents who are currently homeless from public sight, including but not limited to

threatening prosecution or making actual arrests for sleeping outside with her tent or blankets, failure to obey orders to move along, or trespass. Approximately a week after the Sheriff's Deputy broke her arm, the County offered Ms. Rios temporary shelter. She is nevertheless still at risk of homelessness in the near future. Ms. Rios fears that Defendants will prevent her from resting, sleeping or being in public space, and will seize and destroy more of her property without a warrant and adequate notice in the future.

### Lucille Mendez

31.     Plaintiff Lucille Mendez is and has been a resident of the County of Sacramento at all relevant times. Ms. Mendez was born in Sacramento.

32.     Ms. Mendez has been homeless for the past 11 years, after her mother passed away. Ms. Mendez has slept in the Stockton Encampment on and off for the past five years. She has been there for the last seven months. Ms. Mendez does not have any income and cannot pay for refuge in housing or motels. Ms. Mendez attempted to get in touch with County navigators to improve her living situation last winter, but was told no one was available to help her. In March, she accepted motel vouchers and was under a roof for several days. Once the vouchers expired, she found herself back at the Stockton Encampment.

33.     When Ms. Mendez received the Notice, she did not have access to any private space where she could store her possessions. She was forced to choose which of her possessions she could keep and physically carry, and which the County would potentially take indefinitely or destroy.

34.     At the Stockton Encampment, Ms. Mendez slept under a tented tarp. The tarp protected her from the weather and kept her possessions safe. The tarp also provided her with privacy from other members of the community. Ms. Mendez had many personal items under her tarp: clothes, tools, a mattress, blankets, and chairs. It was her home.

35.     Ms. Mendez cannot access an emergency shelter bed and involuntarily lives in public space at the only location where she can meet her basic human needs for shelter and community: the Stockton Encampment. She has tried calling, but she has been unable to find any shelter bed that allows her to bring a dog.

36.     On the day of the raid, Ms. Mendez lost almost everything under her tarp. She no longer has her tools, clothes, mattress, blankets, or chairs. Ms. Mendez watched the Sheriff's Deputies throw out her items she did not abandon but was unable to carry out at the beginning of the raid without any regard to their apparent condition, utility, and value.

37.     After the raid, Ms. Mendez slept in a donated tent outside the locked gates of the Stockton Encampment. Ms. Mendez lived much closer to Stockton Boulevard, a large thoroughfare, than when she was at the Stockton Encampment. She felt unsafe in such close proximity to Stockton Boulevard.

38.     On or around May 9, 2019, the Sheriff's Department had another operation outside of the Stockton Encampment. The Sheriff's Department again ordered people to leave, without written notice. Ms. Mendez was given very little time to move and was threatened with arrest. The Sheriff's Deputies destroyed Ms. Mendez's donated tent and did not offer her shelter. Ms. Mendez does not know where else she can go and rest—the Sheriff's Department has forced her to move multiple times without offering any adequate alternative.

39.     On May 16, 2019, Ms. Mendez was sleeping and resting around the corner from the encampment because she had nowhere else to be. Sheriff's Deputies issued her a Notice of Trespass that evening. On May 17, 2019, she was arrested and taken to jail for trespass.

40.     Based on the raid and her arrest after the raid, Ms. Mendez fears that the Defendants will continue to use these heavy-handed practices to remove herself and other residents that are currently homeless from sight, including but not

limited to threatening prosecution or making additional arrests for sleeping outside with her tent or blankets, failure to obey orders to move along, and/or trespass. Ms. Mendez fears that Defendants will continue to prevent her from sleeping and resting, and will destroy her property without a warrant and adequate notice in the future.

### Palmer Overstreet

41.     Plaintiff Palmer Overstreet has been a resident of the County of Sacramento at all relevant times.

42.     Mr. Overstreet has slept at the Stockton Encampment for over four years. Mr. Overstreet supports himself by fixing and building bikes for people in the community. He makes around $200-$300 per week at most, and cannot get General Assistance because he reached the 3-month time limit. He does not make enough money to pay for housing or shelter.

43.     Mr. Overstreet did not receive any notice from the Sheriff that they would be closing down the Stockton Encampment, though he was aware other people received a document providing 72-hours' notice. Mr. Overstreet did not have a safe space that he could store his items prior to the noticed date.

44.     Mr. Overstreet slept at the Stockton Encampment because he cannot find shelter elsewhere. Last month, he tried calling at least a dozen homeless services providers in the City and County of Sacramento to secure a bed. They were all full and had no beds available. Around one to two weeks before the Sheriff's raid, Mr. Overstreet again tried to call shelters to find a bed. He was again unsuccessful because there is a shortage of beds in the County.

45.     On May 1, 2019, Mr. Overstreet was only able to get some of his belongings out of the Stockton Encampment during the raid. Everything else was destroyed or thrown away without his consent. The Sheriff's Deputies disposed of

his tent, tools, bike parts, cooking equipment, and other personal items. Mr. Overstreet no longer has the tools or parts that he uses to support himself.

46.     The Sheriff's Department gave him a Notice of Trespass and took down his name while he was walking out of the Stockton Encampment. He understood this to be a citation for trespass, but he did not understand why he received it because he was already on his way out of the Stockton Encampment. Mr. Overstreet was not given any motel vouchers, offers for shelters, or other placement that would provide him a safe space to rest.

47.     After the Stockton Encampment closed, Mr. Overstreet slept on the asphalt directly outside of the Stockton Encampment for several days. On May 9, 2019, the Sheriff's Department told everyone, including Mr. Overstreet, that they had to leave and that they cannot camp, sleep, or rest outside of the Stockton Encampment. The Sheriff's Department threatened to arrest anyone who did not leave the area or go to a shelter. The Sheriff's Department did not offer shelter space to Mr. Overstreet during this second displacement. Mr. Overstreet has been forced to move several times, first from the Encampment, then the asphalt outside of the Encampment. Mr. Overstreet does not know where else he is able to go to sleep and rest.

48.     Based on the raid and the Sheriff Department's threat to arrest him on May 9, 2019, Mr. Overstreet fears that the Defendants will continue to use these heavy-handed practices to remove himself and other residents who are currently homeless from sight, including but not limited to threatening prosecution or making actual arrests for sleeping outside with his tent or blankets, failure to obey orders to move along, and/or trespass. Mr. Overstreet fears that Defendants will continue to prevent him from camping, and will destroy his property without a warrant and adequate notice in the future.

**Sacramento Homeless Organizing Committee**

49.    Sacramento Homeless Organizing Committee ("SHOC") is a nonprofit organization incorporated under the laws of the State of California. SHOC was founded in 1987 by advocates, service providers and formerly homeless and low-income individuals to amplify the voice of homeless and low-income community members.

50.    SHOC and its board members seek to address problems of homelessness through publishing a newspaper that educates the public on issues of poverty and homelessness that is distributed by those experiencing homelessness. SHOC also engages in policy advocacy, direct non-violent actions, and education to bridge the gap between the homeless community and others in our society.

51.    In light of the urgency of the impending raid and dislocation of residents at the longstanding Stockton Encampment, several SHOC board members provided education, support and assistance to the residents during the days before and the day of the raid. SHOC, as an advocacy organization, also spoke with community partners in an effort to find a solution to sustain and improve living conditions at the Stockton Encampment.

52.    The evening before the raid, SHOC board members were at the encampment to help organize community groups, residents, and other volunteers. On the day of the raid, SHOC board members assisted residents in understanding their rights. SHOC members were on site to observe and ensure that residents were not illegally arrested or forced to move. Because of the Sheriff's dispersal order, SHOC members were unable to fully perform their tasks. Board members also physically helped some residents move their property out of the Stockton Encampment.

53.    SHOC board members are familiar with Sacramento and available resources. The board members did not and do not know of any place unhoused

individuals can safely relocate without violating the County's rules on camping or placing property on public places.

54.     Because of Defendants' actions, SHOC has been forced to divert resources to not only warn and educate the residents at the Stockton Encampment regarding their legal rights and protections, but also to go beyond SHOC's usual and customary activities to physically help residents move on the day of the raid, and provide physical and emotional support in the days following to assist residents manage the traumatic dislocation.

## DEFENDANTS

55.     Defendant County of Sacramento is a public entity, duly organized and existing under the laws of the State of California. The County has at all times relevant been responsible for the actions, policies, procedures, practices, and customs of the Sacramento County Sheriff's Department. On information and belief, the County directed the raid and eviction of individual Plaintiffs from the Stockton Encampment and directed Defendant SHRA to issue Notices of Trespass to individual Plaintiffs and other residents on May 1, 2019.

56.     Defendant Nav Gill is the Sacramento County Executive. The County Executive is responsible for planning, organizing, directing, and coordinating County activities.

57.     Defendant County of Sacramento, as the Successor Agency for the Redevelopment Agency of the County of Sacramento, owns one parcel within the Stockton Encampment (5700 Stockton Boulevard). On information and belief, the County, in this capacity, directed the eviction of individual Plaintiffs from the Stockton Encampment and directed Defendant SHRA to issue Notices of Trespass to individual Plaintiffs and other residents on May 1, 2019.

58.     Defendant Sacramento County's Sheriff's Department is a department of Sacramento County. The Sheriff's Department enforces the actions, policies,

procedures, practices and customs that led to the raid and eviction of individual Plaintiffs from the Stockton Encampment.

59.   Defendant Scott Jones is the Sheriff of Sacramento County and in that capacity is responsible for the operations of the Sheriff's Department.

60.   Defendant Sacramento Housing and Redevelopment Agency is a joint-powers agency created by the City of Sacramento and the County of Sacramento. Defendant SHRA was designated with responsibility for one parcel within the Stockton Encampment (5716 Stockton Boulevard) by the City of Sacramento, as the Successor Agency to the Redevelopment Agency of the City. On information and belief, SHRA directed the eviction of individual Plaintiffs from the Stockton Encampment. SHRA issued Notices of Trespass to residents of the Stockton Encampment on behalf of SHRA and the County on May 1, 2019 during the raid.

61.   Defendant La Shelle Dozier is the Executive Director of SHRA, and in that capacity is responsible for the scope of the enforcement action taken against individual Plaintiffs and other homeless persons who resided at the Stockton Encampment.

62.   Defendant Deputy Lee is a Deputy of the Sacramento County Sheriff's Department and is responsible for the excessive force against Plaintiff Betty Rios that broke her arm.[1]

63.   All of the above individual defendants are sued in their official capacities with the exception of Defendant Deputy Lee, who is sued in both his individual and official capacities.

64.   Plaintiffs are informed and believe that the acts of Defendants described in this Complaint were undertaken to execute policies and practices of authorized policymakers of Defendant County of Sacramento. These policies and

---

[1] At this time, Plaintiffs have not yet been able to obtain Deputy Lee's full name.

practices were implemented by the remaining Defendants, and each of them, acting as the agent, servant, employee and/or in concert, and/or in conspiracy with each of said other Defendants. Each of the Defendants caused, and is liable for, the unconstitutional and unlawful conduct and resulting injuries by personally participating in said conduct or acting jointly by authorizing, acquiescing or setting in motion policies, plans and actions that led to the unlawful conduct.

## IV.   LEGAL BACKGROUND

65.    At all relevant times, Defendants and their agents acted under color of state law and within the scope of their employment.

66.    Defendants' actions and conduct have resulted and will result in irreparable injury to Plaintiffs. Plaintiffs have no plain, adequate or complete remedy at law to address the wrongs described herein. Defendants have made it clear by their previous and ongoing actions that they intend to continue the unlawful conduct described above. Defendant County has a policy and practice of (1) confiscating and destroying the personal property of individual Plaintiffs and similarly situated homeless individuals without legal basis; and (2) criminalizing individual Plaintiffs' ability to rest and perform other unavoidable acts of survival in public places. The remaining Defendants have and will continue to participate in implementing this policy and practice unless and until restrained by an injunctive decree of this Court.

67.    The acts of Defendants as alleged above constituted violations of individual Plaintiffs' established constitutional rights. Defendants knew or should have known that their conduct in intentionally seizing and immediately destroying all of individual Plaintiffs' personal property was inconsistent with individual Plaintiffs' constitutional rights, and they knew or should have known that issuing a Notice threatening criminal prosecution for "camping or lodging" violates the Eighth Amendment.

68.    An actual controversy exists between Plaintiffs and Defendants because Defendants have engaged in the unlawful and unconstitutional conduct as alleged and intend to continue this unlawful conduct as an ongoing practice and policy of the County of Sacramento. Plaintiffs seek a declaration that the threat of prosecution and imposition of criminal penalties for involuntary conduct associated with being homeless and the seizure and destruction of personal property without proper notices, warrants, or hearing rights is unlawful and unconstitutional.

69.    As a direct and proximate result of the Defendants' unconstitutional and unlawful policies, practices and conduct, individual Plaintiffs have suffered, and will continue to suffer damages, including but not limited to: (1) having no place to sleep, rest, or lie without harassment and threat of criminal punishment by Defendants; and (2) the deprivation and destruction of property, including clothing, bedding, medication, personal documents and other personal possessions, leaving them without their essential personal belongings necessary for shelter, health, well-being and personal dignity.

## V.    CAUSES OF ACTION

## FIRST CAUSE OF ACTION

## Denial of Constitutional Right Against Unreasonable Search and Seizure (Fourth Amendment to the U.S. Constitution; 42 U.S.C. § 1983)

70.    Plaintiffs incorporate each and every allegation of the preceding paragraphs as if fully set forth herein.

71.    Defendants' above described policies, practices, and conduct violate the individual Plaintiffs' right to be free from unreasonable searches and seizures under the Fourth Amendment to the United States Constitution and 42 U.S.C. § 1983 by confiscating and then destroying individual Plaintiffs' property without a warrant.

72.    These unlawful actions were done with intent to deprive the individual Plaintiffs of their right to be secure in their property.

73.     As a direct and proximate consequence of these unlawful acts, individual Plaintiffs have suffered and continue to suffer harm from the loss of their personal property and are entitled to compensatory damages.

## SECOND CAUSE OF ACTION

### Denial of Constitutional Right to Due Process of Law

### (Fourteenth Amendment to the U.S. Constitution; 42 U.S.C. § 1983)

74.     Plaintiffs incorporate each and every allegation of the preceding paragraphs as if fully set forth herein.

75.     Defendants' above described policies, practices, and conduct violate the individual Plaintiffs' right to due process of law under the Fourteenth Amendment of the U.S. Constitution and 42 U.S.C. § 1983.

76.     Defendants had a duty to provide the individual Plaintiffs with notice that their property was at risk of being seized and/or destroyed and an opportunity to be heard. Defendants failed to do so. Further, they did not preserve the individual Plaintiffs' property or provide a means of reclaiming it, thereby stripping individual Plaintiffs of any meaningful opportunity to contest the deprivation of their property.

77.     As a direct and proximate consequence of the acts of Defendants' agents and employees, individual Plaintiffs have suffered and continue to suffer loss of their personal property and are entitled to compensatory damages for their property and other injury to their person.

## THIRD CAUSE OF ACTION

### Violation of Civil Rights, Cruel and Unusual Punishment

### (Eighth Amendment of the U.S. Constitution; 42 U.S.C. § 1983)

78.     Plaintiffs incorporate each and every allegation of the preceding paragraphs as if fully set forth herein.

79.     The County's failure to provide adequate shelter space often forces the individual Plaintiffs and other homeless individuals to sleep in public places in Sacramento County.

80.     Individual Plaintiffs are homeless and slept and rested at the Stockton Encampment with other similarly situated persons. The Stockton Encampment, at the time of closing, had dumpster services, portable restrooms, and a group of residents that created a community to support each other including elected leaders. The Stockton Encampment is a vacant, unused lot, with no imminent plans for development.

81.     Although Defendants knew that individual Plaintiffs are homeless and that the County does not and did not at all relevant times have the available resources to provide individual Plaintiffs shelter beds, Defendants threatened individual Plaintiffs with criminal punishment for resting and sleeping at the Stockton Encampment. Defendants are punishing individual Plaintiffs and other similarly situated homeless people based on their status as homeless persons and their need to sit, lie, or sleep in public spaces.

82.     Defendants' actions that penalize individual Plaintiffs for their homeless status is cruel and unusual punishment in violation of individual Plaintiffs' established rights under the Eighth Amendment of the U.S. Constitution as incorporated in, and applied to the states through, the Fourteenth Amendment.

## FOURTH CAUSE OF ACTION

### Excessive Force

### (Fourth Amendment to the U.S. Constitution; 42 U.S.C. § 1983)

### Plaintiff Betty Rios against Defendant Lee.

83.     Plaintiffs incorporate each and every allegation of the preceding paragraphs as if fully set forth herein.

84.     Plaintiff Betty Rios has a clearly established Constitutional right under the Fourth Amendment to bodily integrity and to be free from excessive force by law enforcement. Defendant Lee's actions and use of force were objectively unreasonable in light of the facts and circumstances confronting them and violated Plaintiff Rios' Fourth Amendment right.

85.     As a result, Plaintiff Rios suffered physical pain and suffering. Defendant Lee's use of force was excessive because he was not in an immediate defense of life situation. There were alternatives for Defendant Lee other than the use of excessive force.

86.     Defendant Lee's use of force was excessive and unreasonable under the circumstances, especially since Plaintiff Rios was unarmed, was leaving the premises, and was complying with their orders.

87.     Defendant Lee's conduct was willful, wanton, and done with reckless disregard for the rights and safety of Plaintiff Rios and therefore warrants the imposition of damages.

88.     As a direct and proximate result of the actions of Defendant Lee, Plaintiff Rios has suffered injuries and is at risk of future injuries and harm.

## FIFTH CAUSE OF ACTION

## Declaratory Relief

## (28 U.S.C. §§ 2201-2202)

89.     Plaintiffs incorporate each and every allegation of the preceding paragraphs as if fully set forth herein.

90.     Under 28 U.S.C. Section 2201, this Court has authority to issue a judgment declaring the rights of the parties and issue an injunction to enforce the Court's declaration.

91.     An actual controversy exists between Plaintiffs and Defendants in that Defendants have engaged in the unlawful and unconstitutional conduct as alleged

and intend to continue this unlawful conduct as an ongoing practice and policy of the County of Sacramento, whereas Plaintiffs claim that these practices are unlawful and unconstitutional and therefore seek a declaration of rights with respect to this controversy.

## VI.   REQUEST FOR RELIEF

WHEREFORE, Plaintiffs request judgment against Defendants as follows:

A.   For a permanent injunction, enjoining and restraining Defendants from:

    a.   Seizing and destroying the personal property of homeless individuals without providing proper notices, warrants, and hearing rights.

    b.   Enforcing the County's stated policy that "every person who camps/lodges or stores property on public land without the permission of the owner is committing a misdemeanor violation" against homeless individuals who cannot obtain shelter and sleep/rest/lay/camp on vacant undeveloped public lots.

    c.   Enforcing any other statutes, ordinances, practices or policies that criminally punish or threaten to punish sleeping/resting/laying/camping on public property by those who are involuntarily in public space.

B.   For a declaration that the enjoined policies, practices, and conduct violate Plaintiffs' Constitutional rights as follows:

    a.   To be free from the seizure and destruction of personal property without proper notices, warrants, or hearing rights in violation of the Fourth and Fourteenth amendment to the U.S. Constitution.

    b.   To be free from cruel and unusual punishment under the 8th amendment to the U.S. Constitution for sleeping/resting/laying/camping on vacant public lots when

1    individuals cannot otherwise obtain shelter.

2    C.   For the return of Plaintiffs' property;

3    D.   For all Plaintiffs, compensatory damages subject to proof;

4    E.   For Plaintiff Rios, special damages including medical expenses subject to

5         proof;

6    F.   For an award of attorney's fees and costs pursuant to 42 U.S.C. § 1988 and

7         any other applicable provisions of law; and

8    G.   For such other and further relief as the Court may deem proper.

9
10   DATED: May 22, 2019

11                         By: _____/s/ Laurance H Lee_____
12                         Laurance Lee
                           Karen Kontz
13                         LEGAL SERVICES OF
                           NORTHERN CALIFORNIA
14                         Attorneys for Plaintiffs

15
16
17
18
19
20
21
22
23
24
25
26
27
28