UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

Betty Rios, et al.,

              Plaintiffs,

    v.

County of Sacramento, et al.,

              Defendants.

No. 2:19-cv-00922-KJM-DB

ORDER

In 2019, Sacramento County and its Sheriff's Department expelled about one hundred unhoused and unsheltered people from a vacant lot owned in part by the County and in part by the Sacramento Housing and Redevelopment Agency (SHRA). The people who lived there allege they lost most of their belongings, from tents and beds to clothes and medicine, because they did not have enough notice or time to remove or reclaim those belongings. They assert claims under the federal and California constitutions and California law against the County, the Sheriff's Department, SHRA, and others. The defendants move to dismiss for lack of jurisdiction and for failure to state a claim. Some of the plaintiffs have standing and have asserted viable claims, so **the motion is granted in part and denied in part**.

I.    **BACKGROUND**

Many years ago, SHRA took over a motel and mobile home park on Stockton Boulevard in Sacramento. First Am. Compl. (FAC) ¶ 11, ECF No. 1. It demolished the motel and mobile

1   homes to make way for an affordable housing project, but the housing project never took root. *Id.*

2   ¶¶ 11–12.  The land remained vacant for more than a decade.  *See id.*  Over the years, many

3   people with nowhere else to live began camping there.  *See id.* ¶ 12.  The County eventually

4   began providing trash services and portable restrooms as well.  *Id.* ¶ 4.

5       Betty "Bubbles" Rios was one of the longest-term residents of the property on Stockton

6   Boulevard.  *See id.* ¶ 24.  She first moved into the now-demolished mobile home park in 1998.

7   *Id.* ¶ 23.  After it was torn down, she had nowhere else to go, so she began camping on the

8   property under a tarp.  *Id.* ¶¶ 24–26.  For nine years she stayed despite sometimes being forced

9   away.  *Id.* ¶ 24.  She kept her clothes, medicine, a breathing machine, and bone stimulator for her

10  arm in her tent.  *Id.* ¶ 26.

11      Lucille Mendez also lived at the Stockton property for many years, beginning more than

12  ten years ago after her mother passed away and she had nowhere to go.  *Id.* ¶ 34.  She stayed at

13  the Stockton property on and off for about five years.  *Id.*  Mendez also lived under a tented tarp,

14  where she kept her clothes, tools, mattress, blankets, and chairs.  *Id.* ¶ 36.

15      Palmer Overstreet also lived at the Stockton property for more than four years.  *Id.* ¶ 46.

16  While he lived there, he fixed and built bikes and made $200 or $300 per week at most.  *Id.*  This

17  was not enough to pay rent and other living expenses.  *See id.* ¶¶ 46–48.  He lived in a tent and

18  kept tools, bike parts, cooking equipment, and his other belongings on the Stockton property.  *Id.*

19  ¶ 49.

20      In early 2019, while Rios, Mendez, and Overstreet were still living at the Stockton

21  Boulevard property, SHRA began building a wrought-iron fence around the lot.  *Id.* ¶ 12.  A few

22  months later, it posted a notice warning that anyone who camped and stored their property on the

23  lot was committing a misdemeanor.  *Id.* ¶ 13.  The notice also stated that a "Site Clean-Up"

24  would begin early in the morning three days later.  *Id.*  The notice did not say how personal

25  property could be reclaimed if it were removed, and it did not offer a phone number.  *Id.* ¶ 14.  It

26  simply listed three places where property might be stored.  *Id.*  Mendez received a copy of this

27  notice.  *Id.* ¶ 35.  Overstreet did not, but he heard about it from others.  *See id.* ¶ 47.  It is unclear

28  whether Rios received a copy of the notice or knew about the "clean up" in advance.  *See id.* ¶ 25.

1    Sacramento County Sheriff's Deputies arrived at 8 a.m. on May 1, 2019, the noticed date.

2  *Id.* ¶ 16.  Some were wearing riot gear and holding batons.  *Id.*  They moved in a line across the

3  property and forced everyone to the sidewalk.  *Id.*  Cars blocked entrances and exits.  *Id.*  A

4  helicopter circled overhead, sounding warnings that the people who lived on the property were

5  part of an unlawful assembly and must disperse or face removal by force and arrest.  *Id.* ¶ 17.

6  After everyone was off the land, the Sheriff's Department drove backhoes, dump trucks, and

7  garbage trucks onto the lot, and everything people had not been able to carry was raked and

8  hauled indiscriminately into the trucks.  *Id.* ¶ 18.  The gates were then locked.  *See id.* ¶ 39.

9  Deputies allowed some people to enter the property and remove items, but many former residents,

10  including the plaintiffs, were not able to recover all of their property.  *Id.* ¶ 19.

11    During this "clean up," a deputy named Le[1] broke Rios's arm.  *Id.* ¶ 27.  Rios was taken to

12  a hospital, and when she returned, most of what she owned was gone.  *Id.* ¶¶ 27–28.  Officers also

13  gave her a "Notice of Trespass" threatening prosecution under state and local law.  *Id.* ¶ 29.

14  Mendez was also forced off the property, and she lost almost everything she had kept under her

15  tarp.  *Id.* ¶ 38.  She had nowhere to go and spent the next few nights in a donated tent outside the

16  locked gate of the lot where she used to live.  *Id.* ¶ 40.  About a week later, deputies forced her

17  away again and took her tent.  *Id.*  She moved around the corner but was soon arrested for

18  trespassing.  *Id.* ¶ 41.  Overstreet also lost his tent, bike parts, cooking equipment, and other

19  belongings.  *Id.* ¶ 49.  Like Rios, he received a notice of trespass, but he was not arrested.  *Id.*

20  ¶ 50.  He slept on the asphalt outside the locked gates until deputies forced him away a few days

21  later.  *Id.* ¶ 51.  Rios, Mendez, and Overstreet do not know what happened to their lost

22  belongings.  All three submitted tort claims to both the County and SHRA; all were denied.  *See*

23  *id.* ¶¶ 30–31, 42–43, 52–53.

24    Board members of the Sacramento Homeless Organizing Committee or "SHOC" were

25  also at the Stockton Boulevard property on the morning of May 1.  *See id.* ¶ 58.  SHOC is a

26  nonprofit organization that seeks "to address problems of homelessness."  *Id.* ¶ 56.  It publishes a

---

[1] The complaint spells this deputy's name "Lee," FAC at 1, but the County spells his name "Le," County Mot. at 1, ECF No. 14.  The court adopts the County's spelling.

1  newspaper about poverty and homelessness, advocates for the homeless, litigates on their behalf,

2  directs nonviolent actions, and offers "education to bridge the gap between the homeless

3  community and others." *Id.* The night before the removal, SHOC board members also helped

4  organize "community groups, residents and other volunteers," and on the morning of the removal,

5  they "were on site to observe and ensure that residents were not illegally arrested or forced to

6  move." *Id.* ¶ 58. SHOC met with the County Supervisor who represents the district that

7  surrounds the Stockton Boulevard property a few days after the raid. *Id.* ¶ 64. Since then, SHOC

8  has tried to improve living conditions of the people who were removed from the Stockton

9  property. *Id.*

10  Rios, Mendez, Overstreet, and SHOC filed a complaint in this court a few months later,

11  *see* Compl., ECF No. 1, and the case is proceeding on their First Amended Complaint, ECF

12  No. 8. Plaintiffs name the County of Sacramento, the Sacramento County Sheriff's Department,

13  the Sacramento Housing and Redevelopment Agency and its executive director, and Deputy Le as

14  defendants. *See id.* They assert nine claims:

15      1.     All of the plaintiffs assert a claim under 42 U.S.C. § 1983 against all of the

16             defendants for unreasonable search and seizure in violation of the Fourth

17             Amendment. FAC at 20.

18      2.     All of the plaintiffs assert a claim under § 1983 against all of the defendants for

19             denial of due process in violation of the Fourteenth Amendment. *Id.* at 20–21.

20      3.     All of the plaintiffs assert a claim under § 1983 against all of the defendants for

21             cruel and unusual punishment in violation of the Eighth Amendment. *Id.* at 21–22.

22      4.     Rios asserts an excessive force claim under § 1983 and the Fourth Amendment

23             against Deputy Le. *Id.* at 22–23.

24      5.     All of the plaintiffs assert a declaratory relief claim under 28 U.S.C. § 2201–2202

25             against all of the defendants. *Id.* at 23.

26      6.     All of the plaintiffs assert a claim for unreasonable search and seizure against all

27             of the defendants under Article I, section 13 of the California Constitution. *Id.*

28             at 23–24.

7.  All of the plaintiffs assert a claim against all of the defendants for the denial of due process under Article I, section 7(a) of the California Constitution. *Id.* at 24.

8.  All of the plaintiffs assert a claim against all of the defendants under California Civil Code § 2080 and Government Code section 815.6, which relate to the seizure and return of personal property. *Id.* at 24–25.

9.  All of the plaintiffs assert a claim against all of the defendants under the Tom Bane Civil Rights Act, California Civil Code section 52.1. *Id.* at 25.

The plaintiffs seek a permanent injunction, declaratory relief, the return of their belongings, damages, fees, costs, and other relief. *Id.* at 25–27.

The defendants have moved to dismiss. *See* County Mot., ECF No. 14; SHRA Mot., ECF No. 16; SHRA Joinder, ECF No. 15.  The plaintiffs have opposed both motions for the most part, *see* Opp'n County, ECF No. 17; Opp'n SHRA, ECF No. 18, but they narrowed their claims in two respects.  First, they agreed to dismiss Deputy Le from all of their claims except the fourth claim for excessive force, Opp'n County at 14, and that claim is not currently in dispute.  Second, they agreed to dismiss all of their claims against SHRA's executive director.  Opp'n SHRA at 12.  The claims against these defendants are therefore dismissed.  As a result, the defendants' motions address claims against the three entities (SHRA, the County, and the Sheriff's Department) and no individuals.  Because the parties do not distinguish their arguments about the County from their arguments about the Sheriff's Department, this order refers to those entities jointly as "the County."

Briefing is complete.  County Reply, ECF No. 20; SHRA Reply, ECF No. 21.  The matter was submitted after a hearing on January 17, 2020.  *See* Hr'g Min., ECF No. 22.[2]  Karen Kontz appeared for the plaintiffs, John Whitefleet appeared for the County, and Peter Cownan appeared for SHRA.  *Id.*

---

[2] Several months have passed since these motions were submitted for decision, but the parties have not brought any intervening authority to the court's attention, and the court is aware of none that would alter its decision.  This order does not preclude a request to reconsider appropriately grounded in intervening authority, if any is available.

## II.   STANDING

The defendants first advance several jurisdictional arguments contesting the plaintiffs' standing.  Article III of the U.S. Constitution limits federal jurisdiction to "Cases" and "Controversies."  U.S. Const. art. III, § 2.  The doctrine of standing is rooted in that limitation.  *See Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016).  Standing has three elements.  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992).  "The plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision."  *Spokeo*, 136 S. Ct. at 1547.  "The party invoking federal jurisdiction bears the burden of establishing these elements."  *Lujan*, 504 U.S. at 561.  Plaintiffs must establish their standing "for each claim" and "'each form of relief sought."  *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006) (quoting *Friends of the Earth, Inc. v. Laidlaw Envt'l Servs. (TOC), Inc.*, 528 U.S. 167, 185 (2000)).  And when, as here, "there are multiple defendants and multiple claims," at least one plaintiff must have standing "as to each defendant and each claim."  *Satchell v. Sonic Notify, Inc.*, 234 F. Supp. 3d 996, 1001 n.2 (N.D. Cal. 2017) (quoting *Reniger v. Hyundai Motor Am.*, 122 F. Supp. 3d 888, 895 (N.D. Cal. 2015)).

The plaintiffs assert two types of claims and requests for relief: retrospective and prospective.  The court begins with the retrospective claims and requests for relief against the County.

### A.   Retrospective Claims and Relief against the County

The County does not contest the individual plaintiffs' standing to assert claims for retrospective relief against it.  Their standing to pursue these claims is clear:  Sheriff's deputies allegedly confiscated and destroyed the individual plaintiffs' belongings without giving them a meaningful option to contest the confiscation, and damages would redress these alleged wrongs.  Because the individual plaintiffs have standing to assert these claims against and seek that relief from the County, it is not necessary to decide whether SHOC does as well.  *See Rumsfeld v. Forum for Acad. & Inst'l Rights, Inc.*, 547 U.S. 47, 52 n.2 (2006) ("[T]he presence of one party with standing is sufficient to satisfy Article III's case-or-controversy requirement.").  But because
/////

6

1    the complaint's allegations also mean that SHOC has standing to assert claims for retrospective

2    relief against the County, the court briefly explains why that is so.

3         An organization's standing is evaluated using "the same inquiry as in the case of an

4    individual:  Has the plaintiff alleged such a personal stake in the outcome of the controversy as to

5    warrant his invocation of federal-court jurisdiction?"  *E. Bay Sanctuary Covenant v. Biden*,

6    993 F.3d 640, 662 (9th Cir. 2021) (quoting *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 378–

7    79,(1982)).  Organizations, like individuals, must therefore demonstrate "(1) they have suffered an

8    injury-in-fact, meaning an injury that is 'concrete and particularized' and 'actual and

9    imminent,' (2) the alleged injury is 'fairly traceable' to the defendants' conduct, and (3) it is 'more

10   than speculative' that the injury is judicially redressable."  *Id.* (quoting *Lujan*, 504 U.S. at 560–

11   61). One way an organization can satisfy these requirements is by showing "both a diversion of its

12   resources and frustration of its mission."  *Fair Hous. Council of San Fernando Valley v.*

13   *Roommate.com, LLC*, 666 F.3d 1216, 1219 (9th Cir. 2012) (quoting *Fair Hous. of Marin v.*

14   *Combs*, 285 F.3d 899, 905 (9th Cir. 2002)).  But if an organization makes such a claim, "[i]t

15   cannot manufacture the injury by incurring litigation costs or simply choosing to spend money

16   fixing a problem that otherwise would not affect the organization at all."  *La Asociacion de*

17   *Trabajadores de Lake Forest v. City of Lake Forest*, 624 F.3d 1083, 1088 (9th Cir. 2010).

18        SHOC's allegations satisfy this test.  First, as for the diversion of resources, SHOC alleges

19   its board members visited the Stockton property the night before the May 1 removal "to help

20   organize community groups, residents, and other volunteers."  FAC ¶ 58.  It alleges that on

21   May 1, its "board members assisted residents in understanding their rights" and "were on site to

22   observe and ensure that residents were not illegally arrested or forced to move."  *Id.*  Later, SHOC

23   also spoke to the representative County Supervisor about the removal, educated and assisted

24   former Stockton Boulevard property residents, spent time discussing potential response efforts,

25   and spoke with others in the community about how to help the people who were removed from the

26   Stockton Boulevard property.  *Id.* ¶ 64.  These allegations suffice to show SHOC's resources were

27   "diverted."  *See, e.g.*, *Fair Hous. Council*, 666 F.3d at 1219 (finding "education and outreach

28   campaigns," among other efforts, were a sufficient diversion of resources).

1    Second, as for the frustration of its mission, SHOC alleges that in addition to its

2  publishing, it pursues policy goals related to homelessness and participates in both "direct non-

3  violent actions" and "education" about poverty and homelessness.  FAC ¶ 56.  The forceful

4  expulsion of many unhoused people from a place where they have lived for years frustrated these

5  goals.  SHOC did not go out of its way to fix some problem "that otherwise would not affect [it]

6  at all." *La Asociacion de Trabajadores*, 624 F.3d at 1088.  It advocated for and educated those

7  expelled from the Stockton property as it had advocated for and educated others.  It pursued a

8  change in policy from the County Supervisor in the same way it had pursued other policies.  It

9  took non-violent direct action as it alleges it has done before.  Like the individual plaintiffs,

10  SHOC has direct standing to sue the County.

11       **B.       Retrospective Claims for Relief against SHRA**

12    Next are the claims against SHRA.  Unlike the County, SHRA contests the plaintiffs'

13  standing to seek retrospective relief from it.  *See* SHRA Mot. at 9–11.  Although it does not also

14  directly address the claims by SHOC, SHRA's arguments apply equally to all of the plaintiffs,

15  and this court has an independent obligation to confirm its subject matter jurisdiction.  *Airline*

16  *Serv. Providers Ass'n v. L.A. World Airports*, 873 F.3d 1074, 1078 (9th Cir. 2017).  The court

17  therefore considers SHOC's standing to assert claims for retrospective relief against SHRA as

18  well.

19    The plaintiffs allege three basic facts about SHRA's involvement: (1) it owned some of

20  the land on Stockton Boulevard, FAC ¶¶ 69; (2) it built a fence around that land after people had

21  been living on it for many years, *id.* ¶ 12; and (3) its staff issued notices of trespass on May 1 at

22  the County's direction while Sheriff's Deputies removed the plaintiffs and others from the land,

23  *id.* ¶¶ 67, 69.  The plaintiffs do not allege SHRA confiscated or destroyed their belongings.  *See*

24  *id.* ¶¶ 79, 84, 101, 106, 109.  They do not allege SHRA created the notices demanding that

25  trespassers leave or face prosecution, decided when or how the May 1 eviction would occur, or

26  prevented them from seeking redress or the return of their property.  *See id.* ¶¶ 84, 106, 109.

27  They do not allege they were charged with trespassing or arrested for trespassing on land owned

28  by SHRA.  *See id.* ¶ 89.  Only Mendoza was arrested, and that arrest was for trespassing on

1   another property "around the corner" a few days later.  *Id.* ¶ 41.  For the same reason, the notices

2   SHRA's staff allegedly distributed are not relevant to any claim for retrospective relief; no

3   plaintiff was arrested or charged for trespassing on SHRA's property, and the plaintiffs do not

4   allege the notice itself caused any concrete harm in the past.

5        The plaintiffs' allegation on "information and belief" that SHRA "directed the eviction,"

6   *id.* ¶ 69, does not show otherwise.  Nor does plaintiffs' allegation, again on information and

7   belief, that SHRA acted "as the agent, servant, employee, and/or in concert, and/or in conspiracy

8   with each of said other Defendants."  *Id.* ¶ 72.  At the pleading stage, plaintiffs must "'clearly

9   allege facts demonstrating' each element" of their standing.  *Spokeo*, 136 S. Ct. at 1547

10  (alterations omitted) (quoting *Warth v. Seldin*, 422 U.S. 490, 518 (1975)).  Claims that SHRA

11  "directed" the other defendants and acted in a "conspiracy" with them do not meet that standard.

12  *See, e.g.*, *Ryan S. v. UnitedHealth Grp., Inc.*, No. 19-1363, 2020 WL 8028609, at *5 (C.D. Cal.

13  Dec. 3, 2020) (dismissing claim for lack of standing because complaint's "vague" and

14  "conclusory" allegations did not "make [the plaintiff's] claim of standing plausible" (citation and

15  quotation marks omitted)); *Kenner v. Holder*, No. 12-1011, 2012 WL 6617331, at *4 (S.D. Cal.

16  Dec. 19, 2012), *aff'd*, 592 F. App'x 583 (9th Cir. 2015) (holding similarly).

17       The plaintiffs also point to SHRA's argument in its legal brief that it "requested the

18  assistance of local authorities in removing the individual Plaintiffs and other trespassers."  SHRA

19  Mot. at 7.  They contend this argument shows SHRA was involved in the May 1 "clean up."  See

20  Opp'n SHRA at 7.  The court cannot accept SHRA's argument at face value; no evidence

21  supports it, and no similar allegation appears in the complaint.  *Cf. Apple Inc. v. Allan & Assocs.*

22  *Ltd.*, 445 F. Supp. 3d 42, 59 (N.D. Cal. 2020) ("[T]he complaint may not be amended by the

23  briefs in opposition to a motion to dismiss." (citation omitted)).  But even if it were appropriate to

24  accept SHRA's argument as fact, considering that fact would not lead to a different result.  SHRA

25  cannot be said to have caused the plaintiffs' injuries if it was the County and its officers who

26  chose to respond unconstitutionally.  *See Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 41–

27  42 (1976) (holding plaintiff cannot rely on harm caused independently by third parties to assert

28  /////

9

1    standing).  The plaintiffs do not have standing to pursue claims for retrospective relief against

2    SHRA.

3            C.      **Prospective Claims and Relief Against All Defendants**

4            The plaintiffs must also have standing to pursue forward-looking or prospective relief,

5    including an injunction or declaratory judgment.  *See Clapper v. Amnesty Int'l USA*, 568 U.S.

6    398, 409 (2013).  The Supreme Court has required plaintiffs requesting prospective relief to

7    allege they face a "concrete," "particularized," and "imminent" injury that is "fairly traceable to

8    the challenged action" and "redressable by a favorable ruling."  *Id.* (quoting *Monsanto Co. v.*

9    *Geertson Seed Farms*, 561 U.S. 139, 149 (2010)).  The Court has recognized that "imminence" is

10   "a somewhat elastic concept" but requires its enforcement nonetheless "to ensure that the alleged

11   injury is not too speculative for Article III purposes."  *Lujan*, 504 U.S. at 564 n.2.  "Imminence"

12   means an injury must be "*certainly* impending."  *Id.* (emphasis in original) (quoting *Whitmore v.*

13   *Arkansas*, 495 U.S. 149, 158 (1990)).

14           Here, the individual plaintiffs have not identified any "certainly impending" concrete and

15   particularized injury.  They were forced off the property on Stockton Boulevard and their

16   belongings were confiscated more than two years ago, and the land is now surrounded by a

17   wrought iron fence and locked gate.  They do not allege they plan to return, and they do not claim

18   any right to return.  They do not allege they are currently living on another property like the

19   property on Stockton Boulevard or that they are at imminent risk of harm from another "clean up"

20   action like the one on May 1, 2019.  They do not allege any criminal proceedings are pending or

21   currently threatened.  Although they allege other trespass notices like those posted on the

22   Stockton Boulevard property have appeared elsewhere, they make no factual allegations to

23   support that conclusory statement.  *See* FAC ¶¶ 60–62.  Without such factual claims, they have

24   not alleged standing.  *See Spokeo*, 136 S. Ct. at 1547; *Ryan S.*, 2020 WL 8028609, at *5; *Kenner*,

25   2012 WL 6617331, at *4.

26           The individual plaintiffs contend they have standing to pursue prospective claims because

27   nothing has changed since May 1, 2019: (1) they remain unhoused and unsheltered, (2) the

28   County still has too little shelter space, (3) SHRA is still "intimately involved in homelessness

planning," (4) SHRA remains "responsible for vacant lots and land throughout the County," and (5) SHRA is not "a completely independent organization from the County," so (6) they will very likely be arrested or ejected from a property like the land on Stockton Boulevard in the future. *See* Opp'n SHRA at 7–8.  Reasonable though this theory may seem on its surface, the Supreme Court has not permitted federal courts to adjudicate claims based on similarly lengthy chains of cause and effect.  In *Clapper v. Amnesty International*, for example, the Court held the plaintiffs lacked standing to seek a declaration and injunction against surveillance because, among other reasons, they did not know whether they were then being or would soon be surveilled.  *See* 568 U.S. at 410–14.  And in *City of Los Angeles v. Lyons*, the Court held the plaintiff, who alleged police officers had choked him without provocation, lacked standing to seek an injunction because it would be "speculation" to infer "that [he] will again be involved in one of those unfortunate instances." 461 U.S. 95, 109 (1983).  So too here: the possibility of a future injury depends too heavily on whether, where, and when shelter and land is available and on what conditions.  The individual plaintiffs have not shown they have standing to seek prospective relief from any defendant.

The requests for prospective relief could proceed if SHOC had standing to assert such a claim, but it does not.  Organizations, like individuals, must demonstrate they have suffered or will imminently suffer a concrete and particularized injury.  *See E. Bay Sanctuary Covenant*, 993 F.3d at 662–63.  SHOC has not met that standard.  It does not allege that its property is at risk, that it will be subject to any notices, or that it will be deprived of due process.  *See* FAC ¶¶ 55–65.  Nor does it claim standing as a representative of anyone who faces an imminent risk of harm. *See* Opp'n County at 13 n.1.  SHOC contends instead, as summarized above, that it has standing because the May 1 "clean up" forced it to divert resources and frustrated its mission.  *See id.* at 11–13.  Its claim of standing, like the individual plaintiffs' claims, therefore depends on the assumption that at least one similar removal is "certainly impending."  The complaint does not include factual allegations about another impending clean-up.  SHOC does not have standing to assert a claim for prospective relief.

*/////*

1    This reasoning applies equally to the claim for declaratory relief, both as a question of

2  subject matter jurisdiction and under the Declaratory Judgment Act's prudential limits.  *See*

3  *United States v. State of Wash.*, 759 F.2d 1353, 1357 (9th Cir. 1985) (en banc) (per curiam) ("The

4  limitations upon issuance of a declaratory judgment, expressed as a doctrine of judicial discretion,

5  reflect concerns similar to those underlying the case and controversy limitation of Article III

6  . . . .").  The plaintiffs have not alleged "concrete facts" about "a dispute in a particular case," but

7  rather a generalized concern that they may soon find themselves in a similar situation.  *See id.*

8         **D.    Summary—Standing**

9         In sum, because no plaintiff has standing to assert claims against SHRA, the claims

10  against it are dismissed.  The plaintiffs' claims and requests for prospective relief also are

11  dismissed in total.  Dismissal is with leave to amend if an amendment would establish a plaintiff

12  had standing at the time this action commenced; dismissal is otherwise without leave to amend

13  but also without prejudice to a new action or to a supplemental pleading under Rule 15(d).  *See*

14  *Northstar Fin. Advisors Inc. v. Schwab Invs.*, 779 F.3d 1036, 1043–48 (9th Cir. 2015) (holding

15  plaintiffs may correct jurisdictional deficiencies by filing new or supplemental complaints but

16  reaffirming a district court must generally have jurisdiction at the time an action commences).

17  The plaintiffs do, however, have standing to assert claims for retrospective relief against the

18  County.  The court therefore turns to the County's motion to dismiss under Rule 12(b)(6).

19  **III.    MOTION TO DISMISS**

20         A party may move to dismiss for "failure to state a claim upon which relief can be

21  granted."  Fed. R. Civ. P. 12(b)(6).  The motion may be granted only if the complaint lacks a

22  "cognizable legal theory" or if its factual allegations do not support a cognizable legal theory.

23  *Hartmann v. Cal. Dep't of Corr. & Rehab.*, 707 F.3d 1114, 1122 (9th Cir. 2013).  The court

24  assumes all factual allegations are true and construes "them in the light most favorable to the

25  nonmoving party."  *Steinle v. City & Cty. of San Francisco*, 919 F.3d 1154, 1160 (9th Cir. 2019)

26  (citation omitted).  If the complaint's allegations do not "plausibly give rise to an entitlement to

27  relief," the motion must be granted.  *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009).

28  /////

A complaint need contain only a "short and plain statement of the claim showing that the pleader is entitled to relief," Fed. R. Civ. P. 8(a)(2), not "detailed factual allegations," *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). But this rule demands more than unadorned accusations; "sufficient factual matter" must make the claim at least plausible. *Iqbal*, 556 U.S. at 678. In the same vein, conclusory or formulaic recitations elements do not alone suffice. *Id.* (quoting *Twombly*, 550 U.S. at 555). This evaluation of plausibility is a context-specific task drawing on "judicial experience and common sense." *Id.* at 679.

These same standards apply to claims against municipal governments under § 1983. *AE ex rel. Hernandez v. Cty. of Tulare*, 666 F.3d 631, 637 (9th Cir. 2012). A plaintiff's allegations "may not simply recite the elements" of a claim under *Monell*. *See id.* (quoting *Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011)). The complaint must "contain sufficient allegations of underlying facts to give fair notice" of the plaintiff's claims and allow the municipal government "to defend itself effectively." *Id.* (quoting *Starr*, 652 F.3d at 1216 ). The plaintiff's allegations must also "plausibly suggest an entitlement to relief, such that it is not unfair to require the opposing party to be subjected to the expense of discovery and continued litigation." *Id.* (quoting *Starr*, 652 F.3d at 1216).

The remaining claims against the County are the first (Fourth Amendment unreasonable search and seizure), second (Fourteenth Amendment deprivation of property without due process of law), third (Eighth Amendment cruel and unusual punishment), sixth (unreasonable search and seizure under the California Constitution), seventh (denial of due process under the California Constitution), eighth (failure to return property under California law), and ninth (violation of the Bane Act).

### A.   Fourth Amendment Unreasonable Search and Seizure (First Claim)

The plaintiffs first claim the County violated their Fourth Amendment rights to be free from unreasonable searches and seizures. FAC at 20. Municipal governments sued under § 1983 can only be held liable for "their own illegal acts." *Connick v. Thompson*, 563 U.S. 51, 60 (2011) (emphasis omitted) (quoting *Pembaur v. Cincinnati*, 475 U.S. 469, 479 (1986)). "They are not vicariously liable under § 1983 for their employees' actions." *Id.* To prevail in a § 1983 claim

1    against a municipal government, plaintiffs must show "(1) that [they] possessed a constitutional

2    right of which [they were] deprived; (2) that the municipality had a policy; (3) that this policy

3    amounts to deliberate indifference to the [plaintiffs'] constitutional right; and (4) that the policy is

4    the moving force behind the constitutional violation." *Dougherty v. City of Covina*, 654 F.3d

5    892, 900 (9th Cir. 2011) (quoting *Plumeau v. Sch. Dist. No. 40 Cty. of Yamhill*, 130 F.3d 432, 438

6    (9th Cir. 1997)).

7        Here, as for the first element, SHOC does not allege it was the subject of any searches or

8    seizures. An unreasonable search or seizure is an element of any § 1983 claim for violation of the

9    right to be free from unreasonable searches and seizures. *See Karam v. City of Burbank*, 352 F.3d

10   1188, 1193 (9th Cir. 2003). SHOC's Fourth Amendment claim is therefore dismissed with leave

11   to amend, if possible within the confines of Rule 11.

12        The individual plaintiffs, by contrast, do allege their belongings were seized. "A seizure

13   conducted without a warrant is per se unreasonable under the Fourth Amendment—subject only

14   to a few specifically established and well delineated exceptions." *Miranda v. City of Cornelius*,

15   429 F.3d 858, 862 (9th Cir. 2005) (quoting *United States v. Hawkins*, 249 F.3d 867, 872 (9th Cir.

16   2001)). The plaintiffs allege here the County had no warrant. As a result, the County bears the

17   burden to show the seizure fell under a "well-delineated exception[]." *Id.*

18        The County contends first that the Fourth Amendment offers the plaintiffs no protection at

19   all because they could not have had any reasonable expectation of privacy in their seized

20   belongings. *See* County Mot. at 6. That position is incorrect. "The Fourth Amendment protects

21   against unreasonable interferences in property interests regardless of whether there is an invasion

22   of privacy." *Miranda*, 429 F.3d at 862. "[A] reasonable expectation of privacy is not required to

23   trigger Fourth Amendment protection against seizures." *Lavan v. City of Los Angeles*, 693 F.3d

24   1022, 1028 (9th Cir. 2012). Although some older decisions sometimes imposed a broad privacy

25   requirement, *see, e.g.*, *Zimmerman v. Bishop Est.*, 25 F.3d 784, 787 (9th Cir. 1994), the Supreme

26   Court has since made clear "that the Fourth Amendment protects possessory and liberty interests

27   even when privacy rights are not implicated," *Lavan*, 693 F.3d at 1028 (citing *Soldal v. Cook

28   Cty., Ill.*, 506 U.S. 56, 63–64 & n.8 (1992)). An officer can seize a person's property, even

1    property kept in a "public area," "only if Fourth Amendment standards are satisfied—for

2    example, if the items are evidence of a crime or contraband." *Soldal*, 506 U.S. at 68.  "Were it

3    otherwise, the government could seize and destroy any illegally parked car or unlawfully

4    unattended dog without implicating the Fourth Amendment." *Lavan*, 693 F.3d at 1029.

5          In support of its argument to the contrary, the City cites only two decisions postdating the

6    Supreme Court's decision in *Soldal*.  Neither is binding, but neither supports the County's

7    position in any event.  In the first, the Sixth Circuit affirmed the district court's decision not to

8    suppress drugs and a gun found during a search conducted with a warrant in a dilapidated house

9    where the defendant was arrested.  *See United States v. Whitehead*, 415 F.3d 583, 587–88 (6th

10   Cir. 2005).  The defendant had only a "casual, business-related association with the property," so

11   the Sixth Circuit held that he could not rely on the Fourth Amendment.  *See id.* at 588.  Here, by

12   contrast, officers were not seizing contraband or evidence of a crime, they did not have a warrant,

13   and the plaintiffs had much more than a "casual" relationship with the Stockton Boulevard

14   property.  Rather, they allege they lived there for many years.  The second decision the County

15   cites is *Church v. City of Huntsville*, 30 F.3d 1332 (11th Cir. 1994).  In *Church*, the Fifth Circuit

16   wrote, in two brief sentences supported by neither analysis nor citations, that the Constitution

17   "does not confer the right to trespass on public lands" or give people the "right to store one's

18   personal belongings on public lands." *Id.* at 1345.  It did not discuss the Fourth Amendment,

19   which is at issue here.

20         The County next contends the plaintiffs' rights were not violated because plaintiffs were

21   trespassing and because it was "reasonable as a matter of law to seize and remove personal

22   property unlawfully stored on the property." *See* County Mot. at 6–7.  The plaintiffs do not agree

23   they were trespassing, but there is no reason to decide whether they were.  Even if they were

24   trespassing, the seizure was not "reasonable" under the terms of the Fourth Amendment.

25         To decide whether a warrantless seizure was "reasonable," a court "must balance the

26   nature and quality of the intrusion on the individual's Fourth Amendment interests against the

27   importance of the governmental interests alleged to justify the intrusion." *United States v. Place*,

28   462 U.S. 696, 703 (1983).  In *United States v. Jacobsen*, for example, the Supreme Court decided

1   the government had acted reasonably when it seized and destroyed a small amount of white

2   powder from a suspicious package.  *See* 466 U.S. 109, 125 (1984).  The white powder was almost

3   certainly contraband, only a "trace amount of the material" was seized, and the seizure had a

4   negligible impact on any interest protected by the Fourth Amendment in that it went unnoticed.

5   *See id.*

6       The balance tips sharply in the opposite direction here.  The government's interests were

7   minimal.  The complaint does not suggest officers had any reason to suspect the plaintiffs'

8   property was contraband or evidence of a crime.  The County's only professed interest was in

9   removing the plaintiffs and their belongings.  It could have accomplished that goal without raking

10  the plaintiffs' belongings indiscriminately into garbage trucks and driving them away.  The

11  plaintiffs' interests, by contrast, weigh heavily.  They lived on the Stockton Boulevard lot.  *See*

12  FAC ¶ 4.  They allege the seized property included their most basic necessities, including their

13  shelter, medicine, beds, and clothing.  *See, e.g., id.* ¶¶ 6, 26, 77.  At this stage, the government has

14  not shown the seizure was reasonable.

15      The Sixth Circuit's unpublished decision in *Mills v. County of Lapeer*, which the County

16  relies on heavily, does not show otherwise.  *See* 498 F. App'x 507 (6th Cir. 2012) (unpublished).

17  In *Mills*, the court upheld the district court's order granting summary judgment to the defendant

18  county because it had an objectively reasonable interest in removing property stored illegally on

19  its land.  *See id.* at 515.  The court did not conclude that a government can confiscate and destroy

20  property indiscriminately as the plaintiffs allege the County did here.

21      Nor can the County prevail at this stage by arguing the seized property was abandoned.

22  *See* County Mot. at 7–8.  Although it is true "there is no seizure in the sense of the law" when

23  officers take abandoned property, *Hester v. United States*, 265 U.S. 57, 58 (1924), the County's

24  decision to advance that argument here is disingenuous at best.  Sheriff's deputies armed with

25  batons and riot gear allegedly forced plaintiffs off the land under threat of violence, arrest, and

26  prosecution.  FAC ¶¶ 16–21.  According to the complaint, the plaintiffs had no choice but to leave

27  almost everything behind.  *See id.* ¶¶ 27–28, 38, 49.  Doing so was not abandonment.  *See Lavan*,

28  /////

1    693 F.3d at 1025 (holding property not abandoned because its owners "were present, explained

2    . . . that the property was not abandoned, and implored the City not to destroy it").

3          The plaintiffs have therefore satisfied the first element of a § 1983 claim under *Monell,*

4    namely deprivation of a constitutional right.  Next, they must allege facts showing the County had

5    a policy or practice.  *Dougherty*, 654 F.3d at 900.  The plaintiffs allege the "clean-up" on May 1

6    was County "policy" because it was conducted as ordered by an officer with policy-making

7    authority.  *See* FAC ¶¶ 66–69.  Local governments can be liable under § 1983 for injuries caused

8    by an official's decisions, even if not written or officially promulgated, if that official had "final

9    policymaking authority" over "the action alleged to have caused the particular constitutional or

10   statutory violation at issue."  *McMillian v. Monroe Cty., Ala.*, 520 U.S. 781, 785 (1997) (quoting

11   *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 737 (1989)).  Even an "isolated constitutional

12   violation" can support a claim under § 1983 if "the person causing the violation has final

13   policymaking authority."  *Lytle v. Carl*, 382 F.3d 978, 983 (9th Cir. 2004) (alteration in original)

14   (quoting *Christie v. Iopa*, 176 F.3d 1231, 1235 (9th Cir. 1999)).  Similarly, if "authorized

15   policymakers approve a subordinate's decision and the basis for it, their ratification would be

16   chargeable to the municipality because their decision is final."  *City of St. Louis v. Praprotnik*,

17   485 U.S. 112, 127 (1988).

18         Here, the complaint includes factual allegations permitting an inference that someone with

19   policy-making authority either directed the removal on May 1 or ratified a subordinate's decision

20   to move forward.  It is reasonable to infer at this early stage that the County would not have

21   deployed dozens of officers, patrol cars, backhoes, dump trucks, garbage trucks, and a helicopter

22   to the Stockton Boulevard property on the morning of May 1 without approval or authorization

23   from the Sheriff and others with final authority.  *See* FAC ¶¶ 16–18; *see also Sanchez v. City of

24   Fresno*, 914 F. Supp. 2d 1079, 1097 (E.D. Cal. 2012) (permitting plaintiffs to move forward with

25   similar allegations that policy makers decided to move forward with "the demolition of shelters

26   and personal property of great importance to plaintiff and others like him").

27   /////

28   /////

17

1    The County does not dispute that the complaint satisfies the remaining two elements of a

2  *Monell* claim.  The motion to dismiss the individual plaintiffs' first claim against the County is

3  therefore denied.

4        **B.        Fourteenth Amendment Due Process (Second Claim)**

5    In the plaintiffs' second claim, they allege the County deprived them of their belongings

6  without due process in violation of the Fourteenth Amendment.  FAC at 20–21.  The same four-

7  part test for municipal liability governs this claim.  The County again contests the plaintiffs'

8  ability to prevail with respect to only the first and second parts: showing their constitutional rights

9  were violated as a result of County policy.  *See* County Mot. at 9–10.  For the reasons in the

10  section above, the complaint includes factual allegations that make out a plausible claim that the

11  events on May 1 occurred with authorization or approval from County officials with final policy-

12  making authority.  The court therefore considers only whether the plaintiffs have alleged a

13  deprivation of rights in violation of the Fourteenth Amendment.

14    The Fourteenth Amendment provides that no State shall "deprive any person of life,

15  liberty, or property, without due process of law."  U.S. Const. amend. XIV, § 1.  "Any significant

16  taking of property" is subject to this clause.  *Fuentes v. Shevin*, 407 U.S. 67, 86 (1972).  When

17  plaintiffs claim the government has deprived them of property without due process of law, a court

18  must decide (1) whether their interests are "encompassed within the Fourteenth Amendment's

19  protection of 'life, liberty, or property,'" and if so, (2) what process was due.  *Lavan*, 693 F.3d at

20  1031 (quoting *Ingraham v. Wright*, 430 U.S. 651, 672 (1977)).

21    Here, again, SHOC does not allege its property was seized.  Its claim is therefore

22  dismissed with leave to amend, if possible within the confines of Rule 11.  The individual

23  plaintiffs do allege their property was seized without due process, and "a homeless person's

24  unabandoned possessions are 'property' within the meaning of the Fourteenth Amendment."

25  *Sanchez v. City of Fresno*, 914 F. Supp. 2d 1079, 1103 (E.D. Cal. 2012).  The plaintiffs have a

26  right to that property under California law.  *See Lavan*, 693 F.3d at 1031 (citing Cal. Civ. Code

27  §§ 655, 663, 671).  They did not abandon that property, but rather allege they were forced to

28  /////

1    leave it behind, so their interests were "encompassed within the Fourteenth Amendment's

2    protection[s]." *Id.* (quoting *Ingraham*, 430 U.S. at 672).

3          The County returns first to its argument that it violated no one's constitutional rights

4    because the plaintiffs were trespassing. *See* County Mot. at 9–10.  At this stage, however, the

5    court accepts the plaintiffs' allegations as it must and considers those allegations in a favorable

6    light. *Steinle*, 919 F.3d at 1160.  And according to the complaint, the County and SHRA had

7    permitted the individual plaintiffs to live on the Stockton property for years.  The County even

8    disposed of their trash and set up portable restrooms. *See* FAC ¶ 88.  These allegations, if proven,

9    would support the plaintiffs' argument that they were not trespassing, at least not before the

10   County began its process to remove them and their belongings.  The County may eventually

11   prove otherwise, but ultimate proof is not the standard in resolving a motion to dismiss under

12   Rule 12(b)(6).

13         What procedure was then "due" to the plaintiffs here?  Three factors are relevant to that

14   question: (1) "the private interest affected by the government action;" (2) "the risk of an

15   erroneous deprivation of such interest through the procedures used, and the probable value, if any,

16   of additional or substitute procedural safeguards;" and (3) "the government's interest, including

17   the function involved and the fiscal and administrative burdens that the additional or substitute

18   procedural requirements would entail." *Matthews v. Eldridge*, 424 U.S. 319, 335 (1976).  In

19   general, these factors require the government to give notice and an opportunity to be heard before

20   it takes property. *United States v. James Daniel Good Real Prop.*, 510 U.S. 43, 48 (1993).  In

21   some settings, such as when an employee has taken property randomly, negligently, or without

22   authorization, the government can comply with the Fourteenth Amendment by offering a

23   "meaningful" remedy after it deprives a person of property. *Hudson v. Palmer*, 468 U.S. 517,

24   533 (1984).  But when a seizure is predictable and authorized, and when a process can be

25   completed in advance, a remedy after the fact is rarely enough. *See Zinermon v. Burch*, 494 U.S.

26   113, 136–39 (1990).

27         Courts within this Circuit have often considered what process is due when a local

28   government removes an unhoused community and its belongings from a particular property.

19

1    These decisions fall along a wide spectrum.  At one end of this spectrum is the policy the Central

2    District court was confronted with in *Lavan v. City of Los Angeles*, 797 F. Supp. 2d 1005 (C.D.

3    Cal. 2011), *aff'd*, 693 F.3d 1022 (9th Cir. 2012).  Los Angeles's policy was to summarily seize

4    and destroy unattended but unabandoned property without advanced notice and often without any

5    chance for a hearing at any time.  *See id.* at 1016–19.  The district court granted the plaintiffs a

6    preliminary injunction barring the city from continuing this policy under the Fourth and

7    Fourteenth amendments, and the Ninth Circuit affirmed.  *See id.* at 1020.  An example from the

8    other end of the spectrum is the procedure the Northern District court considered in *Acosta v. City*

9    *of Salinas*, No. 15-05415, 2016 WL 1446781 (N.D. Cal. Apr. 13, 2016).  The city in that case had

10   given advance notice of a "clean-up" action, had distributed 96-gallon storage bins without cost,

11   had stored larger items in one location, had tagged personal property to ensure it was not lost or

12   destroyed, and had gone from tent to tent to make sure no one was present and that anyone who

13   wanted to remove their belongings could do so.  *See id.* at *8.  The court denied the plaintiffs'

14   request for a temporary restraining order in a detailed written opinion, finding they were unlikely

15   to show the city's process was inadequate.  *See id.* at *8–9.

16        This case falls between the poles represented by *Lavan* and *Acosta*.  The plaintiffs

17   concede the County posted notices that it would require everyone to leave the property on

18   Stockton Boulevard on May 1.  *See* FAC ¶¶ 13–14.  But the notices did not offer meaningful

19   information about how the plaintiffs could retrieve their property if they could not remove it

20   beforehand or how they could contest the removal before May 1.  *See id.*  And on the day of the

21   "clean-up," the plaintiffs allege the County destroyed many of their belongings by dumping them

22   into garbage trucks.  *See id.* ¶ 18.  It is reasonable to infer from these allegations that the County

23   could have taken greater care without much cost.  For example, it could have spoken with the

24   people living on the Stockton Boulevard property before removing their belongings to ensure it

25   knew what was abandoned and what was not abandoned.  Nothing in the plaintiffs' allegations

26   admits an inference that the County needed to act quickly or would have faced a hardship if it had

27   taken greater care.

28   /////

1      The plaintiffs have therefore stated a claim that the County deprived them of their

2  property without due process in violation of the Fourteenth Amendment.  The motion to dismiss

3  the individual plaintiffs' second claim is denied.

4      **C.      Eighth Amendment Cruel and Unusual Punishment (Third Claim)**

5      The plaintiffs next allege the County's removal policy violates the Eighth Amendment's

6  prohibition against cruel and unusual punishment.  *See* FAC at 21–22.  The Ninth Circuit has held

7  "the Eighth Amendment prohibits the imposition of criminal penalties for sitting, sleeping, or

8  lying outside on public property for homeless individuals who cannot obtain shelter," *Martin v.*

9  *City of Boise*, 920 F.3d 584, 616 (9th Cir.), *cert. denied*, 140 S. Ct. 674 (2019), and the plaintiffs

10  allege here that they were threatened with prosecution or arrest.

11      The County's only argument for dismissal of this claim relies on the plaintiffs' decision to

12  leave the Stockton Boulevard property voluntarily rather than stay and risk arrest or conviction.

13  *See* County Mot. at 10–11; County Reply at 7–8.  This argument misapprehends plaintiffs' claim.

14  They do not allege they intend to return to the property on Stockton Boulevard now that it is

15  surrounded by a fence and a locked gate and now that the County and SHRA have made clear

16  they intend to enforce their property rights as landowners against any trespassers.  *See supra*

17  section II.C.  Rather, plaintiffs contend that when publicly owned land is open, vacant, and

18  unfenced, and when it has long been inhabited by people with no other place to go, it is

19  unconstitutional for the government to threaten them with a criminal trespassing prosecution.  *See*

20  Opp'n County at 24 ("Plaintiffs chose a publicly owned lot that has been vacant for over ten years,

21  with no forthcoming development plans, to create a community where they could sleep without

22  isolation and risk of danger.").  *Martin* is not distinguishable on this basis, and the court declines to

23  consider arguments the County has not raised.  The motion to dismiss the Eighth Amendment

24  claim is denied.

25      SHOC, however, does not allege that it faced any prosecution, charge, or arrest.  Its claim

26  is dismissed with leave to amend, if possible within the confines of Rule 11.

27  /////

21

1        **D.    State Law Claims**

2            The plaintiffs next advance several claims under California law.  The court first addresses

3    the State's threshold argument that these claims were not exhausted, then considers each claim in

4    turn.

5                **1.    Exhaustion**

6            The County first argues the plaintiffs' state law claims must be dismissed because they did

7    not submit tort claims under the Government Claims Act before this case began.  County Mot. at

8    12.  Under the Government Claims Act, "no suit for money or damages may be brought against a

9    public entity . . . until a written claim therefor has been presented to the public entity and has been

10   acted upon by the board, or has been deemed to have been rejected by the board . . . ."  Cal. Gov't

11   Code § 945.4.  The plaintiffs satisfied that requirement here.  They filed written claims against the

12   County before they amended their complaint to allege any violations of California law.  *See* FAC

13   ¶¶ 30–31, 42–43, 52–53.

14           The County argues the plaintiffs should have satisfied the Government Claims act before

15   asserting any federal claims as well.  County Mot. at 12.  But it cites no authority to support that

16   assertion.  The court is aware of none.  The only case the County cites, *Le Mere v. Los Angeles*

17   *Unified School District*, undermines its position by confirming that the purpose of the relevant

18   exhaustion requirement is "to provide the public entity sufficient information to enable it to

19   adequately investigate claims and to settle them, if appropriate, without the expense of litigation."

20   35 Cal. App. 5th 237, 246 (2019) (alterations omitted) (quoting *J.J. v. County of San Diego*,

21   223 Cal. App. 4th 1214, 1219 (2014)).  The County has not explained why it could not investigate

22   and attempt to settle the plaintiffs' state law claims while their federal claims were pending.

23           Adopting the County's position would also effectively impose an exhaustion requirement

24   on claims under § 1983.  Plaintiffs would be forced to defer the filing of complaints asserting

25   § 1983 claims until after any related state law claims were exhausted.  Exhaustion is not a

26   prerequisite to an action under § 1983.  *See generally Patsy v. Bd. of Regents of State of Fla.*,

27   457 U.S. 496 (1982).  The plaintiffs adequately allege their compliance with the Government

28   Claims Act.

1
2

**2.    California Constitution Unreasonable Search and Seizure**
     **(Sixth Claim)**

3      The plaintiffs' first state law claim arises under the California Constitution's protection of

4  the "right of the people to be secure in their persons, houses, papers, and effects against

5  unreasonable searches and seizures."  Cal. Const. Art. 1, § 13; *see* FAC at 23–24.  SHOC does

6  not allege it was the subject of any search or seizure.  Its claim is dismissed with leave to amend,

7  if possible within the confines of Rule 11.

8      This leaves the individual plaintiffs' claims.  No California appellate court has decided

9  whether a plaintiff may seek damages for violations of this section; nor has the Ninth Circuit.  *See*

10  *Roy v. Cty. of Los Angeles*, 114 F. Supp. 3d 1030, 1042 (C.D. Cal. 2015); *Julian v. Mission Cmty.*

11  *Hosp.*, 11 Cal. App. 5th 360, 392 (2017) (declining to reach question); *see also Levin v. Barner*,

12  No. C042544, 2004 WL 1490915, at *5 (Cal. Ct. App. July 1, 2004) (unpublished[3]) (declining to

13  reach the question); *but see Drake v. Cty. of Shasta*, No. C086813, 2019 WL 6885056, at *3 (Cal.

14  Ct. App. Dec. 18, 2019) (unpublished) (concluding without analysis that "[t]here is no private

15  right to enforce article 1, . . . section 13 of the California constitution").  The California Supreme

16  Court has, however, decided that a plaintiff may not seek damages for the loss of liberty under a

17  different provision—Article 1, section 7—which prohibits the deprivation of "life, liberty or

18  property without due process of law."  *See generally Katzberg v. Regents of Univ. Cal.*,

19  29 Cal. 4th 300 (2002).  That case sheds light on how the state supreme court is likely to interpret

20  section 13.

21      In *Katzberg*, because the question was unresolved, the court explained generally how to

22  decide whether damages are available as a remedy in a lawsuit alleging violations of the

23  California constitution.  There are two steps.  First, a court must look for evidence of "an

24  affirmative intent either to authorize or to withhold a damages action to remedy a violation."  *Id.*

25  at 317.  Relevant evidence can be found in "the language and history of the constitutional

---

[3] Although the California Rules of Court would prohibit the citation of this unpublished decision in a state court, those rules do not apply in federal courts, which may review and consider unpublished appellate decisions for their persuasive, but not for their precedential, value. *See Nunez by Nunez v. City of San Diego*, 114 F.3d 935, 942 n.4 (9th Cir. 1997); *Inland Concrete Enters., Inc. v. Kraft*, 318 F.R.D. 383, 405–06 (C.D. Cal. 2016).

provision at issue, including whether it contains guidelines, mechanisms, or procedures implying a monetary remedy, as well as any pertinent common law history." *Id.* If this evidence reveals any intent, the court gives effect to that intent, whether it be to authorize or to withhold damages. If the evidence does not reveal any intent related to damages, the court moves to the second step: the "constitutional tort" analysis first adopted by the United States Supreme Court in *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics*, 403 U.S. 388 (1971). In that analysis, a court first considers three factors: "whether an adequate [alternative] remedy exists, the extent to which a constitutional tort action would change established tort law, and the nature and significance of the constitutional provision." 29 Cal. 4th at 317. If these factors "favor recognizing a constitutional tort," the court must then also consider "any special factors counseling hesitation in recognizing a damages action, including deference to legislative judgment, avoidance of adverse policy consequences, considerations of government fiscal policy, practical issues of proof, and the competence of courts to assess particular types of damages." *Id.*

Applying these principles in *Katzberg*, the state supreme court found no evidence of an intent to authorize or forbid damages actions in the text of Article I, section 7, in its history, or in the common law interpreting that section. *See id.* at 317–24. Then, moving to the second step, the court found "no basis upon which to recognize a constitutional tort action for such damages." *Id.* at 324–29. Its analysis was expressly limited to claims based on liberty interests, not property interests. *See id.* at 307, 324.

As noted above, California appellate courts appear not to have undertaken an analysis of Article I, section 13 under *Katzberg*. A number of federal district courts have done so. The most thoroughly reasoned of these decisions appears to be *Wigfall v. City & County of San Francisco*, No. 06-4968, 2007 WL 174434 (N.D. Cal. Jan. 22, 2007). Other California federal district courts have followed *Wigfall*, including in decisions by other judges of this court, *see, e.g.*, *Roy*, 114 F. Supp. 3d at 1043; *Brown v. Cty. of Kern*, No. 06-00121, 2008 WL 544565, at *17 (E.D. Cal. Feb. 26, 2008) (Wanger, J.); *Buzayan v. City of Davis Police Dep't*, CV No. 06-01576, 2007 WL 2288334, at * 8–9 (E.D. Cal. Aug. 8, 2007) (England, J.).

/////

1        This court agrees with the Northern District court's persuasive analysis of Article I,

2  section 13 in *Wigfall* under the first part of the *Katzberg* test: nothing about that section or its

3  history suggests any intent to permit or forbid damages.  *See* 2007 WL 174434, at *5.  Section

4  13 does not mention damages:

5         The right of the people to be secure in their persons, houses, papers and effects
6         against unreasonable searches and seizures may not be violated; and a warrant may
7         not issue except on probable cause, supported by oath or affirmation, particularly
8         describing the place to be searched and the persons and things to be seized.

9  Cal. Const. Art. 1, § 13.  Nor can any intent to permit damages be inferred from this language, as

10  for example can be inferred from contrasting language in section 19.  *See* Cal. Const. Art. I,

11  § 19(a) ("Private property may be taken or damaged for a public use and only when just

12  compensation, ascertained by a jury unless waived, has first been paid to, or into court for, the

13  owner. . . .").  Section 13 includes only general legal principles, not specific "guidelines,

14  mechanisms, or procedures" implying an intended remedy.  *Katzberg*, 29 Cal. 4th at 321 (quoting

15  *Leger v. Stockton Unif. Sch. Dist.*, 202 Cal. App. 3d 1448, 1455 (1988)).  Nor have the parties

16  cited any drafting history, ballot materials, historical records, or common law decisions

17  suggesting section 13 was adopted with an intent to make damages available.  The court is aware

18  of none.  *Cf. Wigfall*, 2007 WL 174434, at *5 (rejecting citations of a 1974 ballot measure

19  renumbering the due process and equal protection clauses); *Katzberg*, 29 Cal. 4th at 318–21

20  (reviewing the same and other history).  As a result, in this case, as in *Katzberg*, no evidence

21  suggests section 13 was intended either to withhold damages or make them available.

22        But the analysis does not end there.  The next step is the far more uncertain "constitutional

23  tort" analysis of *Bivens*.  The district court's reasoning in *Wigfall* offers little guidance.  *See* 2007

24  WL 174434, at *5–6.  It considered only whether the plaintiffs in that case had other remedies.  It

25  found they did, and many of those alternatives were a far better fit for their factual allegations.

26  *See id.*  Here, by contrast, the plaintiffs' claim of an unconstitutional seizure is the obvious fit for

27  their factual allegations, i.e., that the County confiscated or destroyed their belongings without

28  probable cause.  Section 13 directly forbids governments from taking property unreasonably.

29  /////

1    One rebuttal to this conclusion is that plaintiffs have an adequate alternative remedy in

2    federal law.  The California Supreme Court expressly declined to consider the relevance of

3    federal remedies in *Katzberg*, *see* 29 Cal. 4th at 327 n.29, but other federal district courts and at

4    least one intermediate state appellate court have held that § 1983 is a viable alternative to a state

5    constitutional tort.  *See, e.g.*, *Wigfall*, 2007 WL 174434, at *6 (citing *Carlsbad Aquafarm, Inc. v.

6    State Dep't of Health Servs.*, 83 Cal. App. 4th 809, 822 (2000)).

7    This logic is at first blush plausible.  Plaintiffs can indeed obtain damages under § 1983 in

8    many of the situations in which they would be likely to seek damages under Article I, section 13.

9    But the California Supreme Court has recognized that section 13 imposes "independent and more

10   exacting standards" than the U.S. Constitution.  *In re Lance W.*, 37 Cal. 3d 873, 879 (1985); *see

11   also People v. Brisendine*, 13 Cal. 3d 528, 549 (1975), *superseded by statute on other grounds as

12   noted in In re Lance W.*, 37 Cal. 3d 873.  The limits on federal claims under § 1983 only amplify

13   this difference.  For example, § 1983 claims against individual defendants are subject to a court-

14   created qualified immunity defense, and claims against municipal defendants are subject to the

15   additional requirements the Supreme Court defined in *Monell*.  Under California law, by contrast,

16   "a public employee is liable for injury caused by his act or omission to the same extent as a

17   private person," Cal. Gov't Code § 820(a); public entities are "liable for injury proximately

18   caused by an act of omission of an employee of the public entity within the scope of his

19   employment . . . ," *id.* § 815.2(a); and different, often much more specific immunities apply, *cf.,

20   e.g.*, *id.* § 844.6 (concerning injuries to prisoners and injuries caused by prisoners).  So it is far

21   from obvious that damages claims under § 1983 offer an adequate alternative in all cases.

22   Nor would inferring a damages remedy seem to work much of a change in "established

23   tort law."  *See Katzberg*, 29 Cal. 4th at 327–28.  A "constitutional tort" claim based on an

24   unreasonable seizure of personal property would parallel rather than conflict with the common

25   law of torts.  California tort law awards compensation to those who can prove they suffered

26   damages at the hands of a defendant who wrongfully disposes of property the claimants owned or

27   had a right to possess.  *See Mindys Cosms., Inc. v. Dakar*, 611 F.3d 590, 601 (9th Cir. 2010)

28   /////

1  (defining elements of a conversion claim and citing *Oakdale Vill. Group v. Fong*, 43 Cal. App.

2  4th 539, 543 (1996)).

3        Finally, the "nature and significance" of section 13 might also weigh in favor of creating a

4  "constitutional tort."  *Katzberg*, 29 Cal. 4th at 317.  No one here suggests the right to be free from

5  unreasonable government searches and seizures is an insignificant one.

6        In sum, the first part of the *Katzberg* test does not show whether damages were intended

7  as a remedy for violations of Article 1, section 13 of the California Constitution, and many of the

8  considerations relevant to the second part of the *Katzberg* test may weigh in favor of creating

9  such a "constitutional tort."  But no California appellate court has considered that question, and

10 the parties have offered very few citations and arguments to guide the court in its duty "to predict

11 how the state high court would resolve" this dispute.  *Isabel v. Reagan*, 987 F.3d 1220, 1229 (9th

12 Cir. 2021) (quoting *Dimidowich v. Bell & Howell*, 803 F.2d 1473, 1482 (9th Cir. 1986)).  In this

13 situation, the fairest resolution is to deny the County's motion to dismiss without prejudice to

14 reasserting at a later date, such as in a motion for summary judgment or for judgment on the

15 pleadings, that a private action is not available.  "It is the burden of the party bringing a motion to

16 dismiss for failure to state a claim to demonstrate that the requirements of Rule 8(a)(2) have not

17 been met."  *Bryant v. Apotex, Inc.*, No. 12-01377, 2013 WL 394705, at *5 (E.D. Cal. Jan. 30,

18 2013) (quoting *Gallardo v. DiCarlo*, 203 F. Supp. 2d 1160, 1165 (C.D. Cal. 2002)).  The County

19 has not carried that burden.

20              **3.        California Constitution Denial of Due Process (Seventh Claim)**

21        The plaintiffs next allege the County is liable under Article I, section 7(a) of the California

22 constitution, which provides no person may be "deprived of . . . property without due process of

23 law."  Cal. Const. Art. I, § 7(a); FAC at 24.  Here, again, SHOC does not allege it was deprived of

24 due process, so its claim under section 7(a) is dismissed.  The individual plaintiffs do allege they

25 were deprived of due process.  As is true of Article I, section 13, no California court has decided

26 whether damages are available to plaintiffs who allege violations of section 7(a), at least not when

27 it comes to property.  *See Walls v. Cent. Contra Costa Transit Auth.*, No. 08-0224, 2012 WL

28 581362, at *3–4 (N.D. Cal. Feb. 22, 2012).  The state supreme court's decision in *Katzberg* did

1  focus on section 7(a), but as noted above, its reasoning was limited to liberty interests.  *See*

2  29 Cal. 4th at 324.  In light of that difference, another federal district court has permitted a claim

3  for damages to move forward under section 7(a)'s protection of property rights.  *See Walls*, 2012

4  WL 581362 at *4.  Its reasoning is persuasive.  Much of the discussion in the previous section also

5  applies to section 7(a).  The court therefore denies the motion to dismiss the individual plaintiffs'

6  claims under section 7(a), but without deciding finally whether damages are available for

7  violations related to property interests.  SHOC's claim is dismissed with leave to amend, if

8  possible within the confines of Rule 11.

9  **4.      Failure to Return Property (Eighth Claim)**

10  The plaintiffs next allege the County has violated "California Civil Code § 2080 *et seq.*

11  and Government Code § 815.6."  FAC at 24–25.  Section 2080 provides that "any public or

12  private entity that finds and takes possession of any . . . goods, things in action, or other personal

13  property . . . shall, within a reasonable time, inform the owner, if known, and make restitution

14  without compensation, except a reasonable charge for saving and taking care of the property."

15  Under section 2080.10, "[w]hen a public agency," including a county, "obtains possession of

16  personal property from a person for temporary safekeeping," that agency must, among other

17  obligations, "[t]ake responsibility for the storage, documentation, and disposition of the

18  property," and "[p]rovide the person from whom the property was taken with a receipt and

19  instructions for the retrieval of the property."  Cal. Civ. Code § 2080.10(a), (d).  But these

20  provisions do not apply to property that has been "intentionally abandoned by their owner."  *Id.*

21  § 2080.7.  Finally, under Government Code section 815.6, if "a public entity is under a mandatory

22  duty imposed by an enactment that is designed to protect against the risk of a particular kind of

23  injury, the public entity is liable for an injury of that kind proximately caused by its failure to

24  discharge the duty unless the public entity establishes that it exercised reasonable diligence to

25  discharge the duty."

26  SHOC does not allege it was deprived of property, so it cannot obtain relief under these

27  sections.  Its claim is dismissed with leave to amend, if possible within the confines of Rule 11.

28  The individual plaintiffs do allege the County fell short of the requirements outlined above.  Their

1  allegations state a plausible claim under those provisions.  The County argues again it is not liable

2  because the plaintiffs' property was abandoned, County Mot. at 14–15, but as discussed above,

3  the individual plaintiffs allege they were forced to leave their belongings behind under threat of

4  violence, arrest, and prosecution.  The motion to dismiss the individual plaintiffs' claim is denied.

5         **5.**      **Bane Act (Ninth Claim)**

6        The plaintiffs' final claim cites the Bane Act.  FAC at 25.  The Bane Act "protects

7  individuals from conduct aimed at interfering with rights that are secured by federal or state law,

8  where the interference is carried out 'by threats, intimidation or coercion.'"  *Reese v. Cty. of*

9  *Sacramento*, 888 F.3d 1030, 1040 (9th Cir. 2018) (quoting *Venegas v. Cty. of Los Angeles*,

10  153 Cal. App. 4th 1230, 1232 (2007)).  When a Bane Act claim is based on an alleged federal

11  constitutional violation, as here, plaintiffs may rely on the same allegations to prove both that the

12  defendant deprived them of a constitutional right and threatened, intimidated or coerced them

13  under the Bane Act.  *See id.* at 1043 ("[T]he Bane Act does not require the 'threat, intimidation or

14  coercion' element of the claim to be transactionally independent from the constitutional violation

15  alleged.").  A complaint must also include factual allegations that allow the court to infer the

16  defendant had a "specific intent" to violate the plaintiff's rights.  *See id.* (quoting *Cornell v. City*

17  *& Cty. of San Francisco*, 17 Cal. App. 5th 766, 801 (2017)).

18        The complaint meets this pleading standard for the individual plaintiffs only.  They have

19  stated a claim based on their federal constitutional rights, and their allegations allow an inference

20  that the County acted with the necessary specific intent by indiscriminately and summarily

21  confiscating and disposing of their belongings.

22        SHOC's claims do not meet this standard.  As explained above, it has not stated an

23  underlying federal or state claim.  Its Bane Act claim is dismissed with leave to amend, if possible

24  within the confines of Rule 11.

25  **IV.**    **CONCLUSION**

26        The motions to dismiss are **granted in part and denied in part** as follows:

27        •      All claims against La Shelle Dozier are dismissed without leave to amend.

28  /////

1      •      With the exception of claim 4, all claims against Deputy Le are dismissed without
2             leave to amend.
3      •      All claims against SHRA are dismissed for lack of standing, with leave to amend if
4             an amendment would establish a plaintiff had standing to assert a claim against
5             SHRA at the time this action commenced.  The claims against SHRA are
6             otherwise dismissed without leave to amend, but also without prejudice to a new
7             action or to a supplemental pleading under Rule 15(d).
8      •      The plaintiffs' requests for prospective relief from the County, including claim 5
9             for declaratory judgment, are dismissed for lack of standing, with leave to amend
10            if an amendment would establish a plaintiff had standing to assert such a claim at
11            the time this action commenced.  These claims are otherwise dismissed without
12            leave to amend, but also without prejudice to a new action or to a supplemental
13            pleading under Rule 15(d).
14     •      The County's motion to dismiss claims 1, 2, 3, 6, 7, 8, and 9 is denied as to the
15            individual plaintiffs and granted as to SHOC.  This order does not bar the County
16            from later arguing the plaintiffs may not assert claims for damages under Article 1,
17            sections 7(a) and 13 of the California Constitution.  SHOC is granted leave to
18            amend if possible within the confines of Rule 11.  **Any amended complaint must**
19            **be filed within twenty-one days**.
20     A status conference by videoconference is set for **October 28, 2021 at 2:30 p.m.** before
21     the undersigned.
22     This order resolves ECF Nos. 14 and 16.
23     IT IS SO ORDERED.
24     DATED:  September 29, 2021.

_____
CHIEF UNITED STATES DISTRICT JUDGE